

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00476-CV

MARK B. HARRISON                                                        APPELLANT

V.

BNSF RAILWAY COMPANY                                                    APPELLEE

----------

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

## I. INTRODUCTION

We consider in this appeal whether a ballast regulation promulgated under the Federal Railroad Safety Act (FRSA) precludes Appellant Mark B. Harrison's ballast-related claim under the Federal Employers' Liability Act (FELA). We hold that it does and will therefore affirm the trial court's grant of summary judgment in favor of Appellee BNSF Railway Company.

## II. BACKGROUND

BNSF hired Harrison in 1993. He worked as a brakeman for a year before being promoted to a locomotive engineer.

One day in April 2008, Harrison directed a train onto a siding located in Becker, New Mexico (the Becker Siding). Harrison had been instructed to tie down the train and then catch a taxi to Belen, New Mexico. BNSF owned and maintained the track at the Becker Siding and used railroad ballast to support the track structure.[1]

According to Harrison, he set the hand brakes on the engines while the conductor set the brakes on the cars. Harrison then disembarked one of the engines without any incident, but he climbed back onto the train to confirm that he had removed the reverser. When Harrison descended down the engine's steps a second time, a "big piece" of ballast gave way under his foot, and he "went down" on his knee. Harrison recalled that in the area where he fell, the ballast ranged in size from roughly 2-1/2 or 3 inches in diameter to about as large as a softball or a small grapefruit.

---

[1] "'Ballast' is a technical term used by the railroad industry to denote, what would otherwise be commonly known as, crushed rock." *CSX Transp., Inc. v. Pitts*, 61 A.3d 767, 770 n.1 (Md. 2013). Track, or "mainline," ballast "is the stone or other material placed underneath and around the railroad tracks to provide the structural support, drainage, and erosion protection necessary for safe rail travel." *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 428 (6th Cir. 2009), *cert. denied*, 558 U.S. 1147 (2010).

Harrison sued BNSF under the FELA, alleging that he "suffered injuries to his knee and body generally as a result of slipping on *oversized* ballast on a *steep* incline," that BNSF owed him "a duty to provide a reasonably safe place to work and a duty to provide reasonably safe ballast and a reasonably safe area to disembark and walk so that he could safely do his job," and that BNSF breached those duties owed to him, causing his injuries. [Emphasis added.] BNSF pleaded the affirmative defense of preemption and filed a traditional and no-evidence motion for summary judgment. BNSF argued in the motion that an FRSA ballast regulation covers the subject matter of mainline ballast characteristics and precludes Harrison's ballast-related FELA negligence claim. The trial court granted the motion.[2] This appeal followed.

## III. STANDARD OF REVIEW

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

---

[2]The judgment generally granted BNSF's motion for summary judgment; it did not specifically grant summary judgment on either the traditional or the no-evidence ground. We will review the propriety of the summary judgment on the traditional ground. *See Murphy v. Reynolds*, No. 02-10-00229-CV, 2011 WL 4502523, at *3 n.4 (Tex. App.—Fort Worth Sept. 29, 2011, no pet.) (mem. op.).

3

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008); *see* Tex. R. Civ. P. 166a(b), (c).

## IV. FRSA PRECLUSION OF HARRISON'S FELA CLAIM CONCERNING MAINLINE BALLAST SIZE AND COMPOSITION

Harrison argues in his first issue that the trial court erred by granting BNSF summary judgment because the FRSA does not preclude his FELA claim. In his second issue, Harrison argues that the trial court erred by granting BNSF summary judgment because even if his FELA claim is precluded, BNSF failed to establish the defense as a matter of law. BNSF responds that it met its burden to show that Harrison's FELA claim is precluded by the FRSA.

### A. Preclusion Conditioned Upon Preemption

The purpose of the FRSA is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C.A.

4

§ 20101 (West 2007). In furtherance of this purpose, it requires that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." *Id.* § 20106(a) (West Supp. 2013). To maintain this goal of national uniformity, the FRSA requires the Secretary of Transportation to "prescribe regulations . . . for every area of railroad safety." *Id.* § 20103(a) (West 2007). One such regulation promulgated under the authority of the FRSA addresses ballast:

> Unless it is otherwise structurally supported, all track shall be supported by material which will --
>
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
>
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
>
> (c) Provide adequate drainage for the track; and
>
> (d) Maintain proper track crosslevel, surface, and alinement.

49 C.F.R. § 213.103 (2012). The FRSA also contains an express preemption clause, which states that "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation . . . prescribes a regulation or issues an order *covering the subject matter* of the State requirement." 49 U.S.C.A. § 20106(a)(2) (emphasis added).

Federal preemption of state law is grounded in the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary

5

notwithstanding." *Delta Air Lines, Inc. v. Black*, 116 S.W.3d 745, 748 (Tex. 2003), *cert. denied*, 540 U.S. 1181 (2004) (quoting U.S. Const., art. VI, cl. 2). Thus, "if a state law conflicts with federal law, the state law is preempted and 'without effect.'" *Id.*

The United States Supreme Court has explained that when an FRSA regulation, under § 20106(a)(2), covers the subject matter of a state law, it thereby preempts the state law. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664–65, 113 S. Ct. 1732, 1737–38 (1993). In *Easterwood*, Thomas Easterwood was killed when a CSX train collided with his truck at a street crossing. *Id.* at 661, 113 S. Ct. at 1736. Easterwood's widow sued CSX for wrongful death, alleging that CSX was negligent under Georgia law for, among other things, operating the train at an excessive speed. *Id.* CSX argued that the excessive-speed claim was preempted by the FRSA because an FRSA speed regulation set the maximum allowable operating speeds by which all freight and passenger trains could travel for each particular class of railroad track, thereby "cover[ing] the subject matter" of Easterwood's widow's state claim, and the train involved in the collision was traveling at a speed *less than* the maximum speed permitted for the class of track where the collision occurred. *Id.* at 663, 673, 113 S. Ct. at 1737, 1742. The Supreme Court agreed with CSX on the issue, explaining that to demonstrate that the FRSA regulation had preemptive effect, CSX had to establish that it did more than simply "touch upon" or "relate to" the subject matter of the Georgia negligence law pertaining to excessive speed; the regulation had to "substantially subsume" the

6

subject matter of the relevant state law. *Id.* at 664, 113 S. Ct. at 1738. The Supreme Court reasoned,

> On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that [Easterwood's widow] seeks to impose on [CSX].

*Id.* at 674, 113 S. Ct. at 1742. Thus, as BNSF points out, the FRSA speed regulations substantially subsume state common-law speed restrictions.

In this case, Harrison did not allege a state-law claim; he alleged a FELA claim, which provides railroad employees with a federal cause of action for injuries "resulting in whole or in part from the negligence" of the railroad. 45 U.S.C.A. § 51 (West 2007). This distinction is significant because the doctrine of federal preemption is inapplicable to a potential conflict between two federal statutes—here, the FRSA and the FELA. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 86 (2nd Cir. 2006). Nonetheless, a number of federal courts have determined that the FRSA's express preemption clause, § 20106(a)(2), considered in *Easterwood*, can be applied to *preclude* a federal tort claim under the FELA if a state-law claim implicating similar conduct would be preempted by the FRSA. *See, e.g.*, *Lane v. R.A. Sims, Jr. Inc.*, 241 F.3d 439 (5th Cir. 2001); *Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773 (7th Cir. 2000), *cert. denied*, 531 U.S. 1112 (2001).

7

For example, in *Lane*, Lane asserted a FELA claim against his employer, CSX, for injuries that he sustained when the train on which he was working collided with a tractor trailer at a crossing. *Lane*, 241 F.3d at 441–42. Lane alleged that the train was traveling at an excessive speed when the collision occurred. *Id.* But like the train in *Easterwood*, the train on which Lane was working was traveling below the maximum speed limit established by the FRSA speed regulation, 49 C.F.R. § 213.9 (2012). *Id.* Considering *Easterwood*'s conclusion that the FRSA's speed regulation preempts a state law excessive-speed claim, the issue for the Fifth Circuit was whether the same regulation *precluded* a railroad employee's excessive-speed claim under the FELA. *Id.* Referencing the FRSA's goal of national uniformity, the court reasoned,

> Such uniformity can be achieved only if the regulations covering train speed are applied similarly to a FELA plaintiff's negligence claim and a non-railroad-employee plaintiff's state law negligence claim. Otherwise, a railroad employee could assert a FELA excessive-speed claim, but a non-employee motorist involved in the same collision would be precluded from doing so. Dissimilar treatment of the claims would have the untenable result of making the railroad safety regulations established under the FRSA virtually meaningless . . . .

*Id.* at 443; *see Waymire*, 218 F.3d at 776 (considering FRSA preclusion of FELA excessive-speed claim and reasoning that "[i]t would thus seem absurd to reach a contrary conclusion in this case when the operation of both trains was identical and when the Supreme Court has already found that the conduct is not culpable negligence"); *but see Earwood v. Norfolk S. Ry. Co.*, 845 F. Supp. 880, 891 (N.D. Ga. 1993) (holding that the FRSA did not preclude a railroad employee's unsafe-

8

speed FELA claim because the relevant federal regulations "were not directed at the issue of employee safety" and established minimum safety requirements).

Although *Lane*'s analysis is certainly relevant for purposes of considering whether the FRSA can preclude a FELA claim, our case does not involve an excessive-speed claim; instead, it concerns allegations of "oversized" mainline ballast used on a "steep incline." At least one federal circuit court has specifically addressed whether the FRSA's ballast regulation—§ 213.103—can preclude a FELA claim premised upon the alleged negligent use of oversized mainline ballast. *See Nickels*, 560 F.3d at 430–31.

In *Nickels*, the plaintiffs sued their former railroad employers for injuries that were allegedly caused by years of walking on oversized ballast. *Id.* The gist of the claims was that "the railroads used large mainline ballast in areas where the smaller yard ballast would have sufficed." *Id.* at 431. The district court granted the railroads summary judgment, concluding that the FRSA ballast regulation precluded the plaintiffs' FELA claims. *Id.* at 428. The initial inquiry before the Sixth Circuit was "whether a FELA claim is precluded if the same claim would be preempted by the FRSA if brought as a state-law negligence action."[3] *Id.* at 429–30. The court agreed with the *Lane* and *Waymire* courts'

---

[3] The Sixth Circuit addressed the preclusion consideration before examining whether the ballast regulation "covered" the subject matter of the plaintiffs' claims because, logically, if the FRSA could not preclude the plaintiffs' FELA claims, then it would have been of no consequence whether the FRSA preempted a similar state-based claim.

9

observations about the adverse effects of treating similar state and federal claims dissimilarly and reasoned,

> Although the courts in *Lane* and *Waymire* addressed FELA claims of unsafe train speed in light of FRSA speed-limit regulations, the FRSA's concern for uniformity leads us to reach the same conclusion regarding ballast regulations. And while railroads may face a lesser likelihood of state-law claims alleging negligent ballast composition, any exposure to conflicting standards undermines uniformity. The plaintiffs' claims are precluded by the FRSA if they would have been preempted if brought by a non-employee under state law.

*Id.* at 430 (citation omitted). Other courts have concluded similarly. *See, e.g.*, *Lybrand v. Union Pac. R.R. Co.*, No. 5:10CV00045, 2012 WL 1436690, at *2 (E.D. Ark. Apr. 25, 2012); *Brenner v. Consol. Rail Corp.*, 806 F. Supp. 2d 786, 794 (E.D. Pa. 2011); *Norris v. Cent. of Ga. R.R. Co.*, 635 S.E.2d 179, 183 (Ga. Ct. App. 2006, cert. denied); *see also Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 889–92 (8th Cir. 2012) (refusing to create a circuit split and assuming that the FRSA could preclude FELA for purposes of analysis).

Harrison argues that the FRSA will preclude the FELA only when a "'positive repugnancy' between the two makes them irreconcilable," *see Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149 (1992), and that there is no irreconcilable conflict between the FRSA ballast regulation and Harrison's FELA claim. Neither *Lane* nor *Waymire* nor *Nickels* applied the "positive repugnancy" standard. We think the reason why is because, under the reasoning in those cases, a FELA claim is precluded by the FRSA if the same claim would be preempted if brought by a non-employee under state law, and a

10

state-law claim is preempted by the FRSA when a regulation "covers," or "substantially subsume[s]," the subject matter of the plaintiff's claim. 49 U.S.C.A. § 20106(a)(2); *Easterwood*, 507 U.S. at 664, 113 S. Ct. at 1738. Thus, at least in this context, "coverage," not positive repugnancy, is the relevant inquiry.

Harrison further argues that the FRSA's goal of uniformity should not drive our preclusion analysis because, unlike a railroad's compliance with the FRSA's speed regulations, which is readily ascertainable (the train was either traveling below the maximum speed limit or not), the standards for complying with the FRSA's ballast regulation are "so vague that uniformity is impossible." Referencing the ballast regulation requirements that all track shall be supported by material that will "[p]rovide adequate drainage" and "[m]aintain proper track crosslevel, surface, and alinement," Harrison contends that "courts' determinations of compliance—and therefore preclusion—will necessarily vary from court to court and case to case" because it is "impossible to have uniform standards as to what constitutes 'adequate' drainage or 'proper' track alinement." We disagree.

Determining whether ballast provided adequate drainage or proper track alignment is no less readily ascertainable than determining the speed at which a train was traveling when it collided with a vehicle at a crossing. As BNSF did in this case, a railroad is free to elicit the opinion of an individual who is qualified to opine about a railroad's compliance or noncompliance with the ballast regulation. Moreover, the FRSA's goal of uniformity is not unachievable simply because the ballast regulation allows for some discretion as to what constitutes adequate

11

drainage or proper track alignment. Although the *means* by which a track owner may comply with the ballast regulation may vary from one geographical area to another—no doubt due to the diversified topography and soil composition existing in our environment—the *standards* themselves, like the speed regulations, are certain. *See* 49 C.F.R. § 213.103. Just as the FRSA's goal of uniformity would be undermined by treating an excessive-speed FELA claim differently than an excessive-speed state-law claim, *see Lane*, 241 F.3d at 443, uniformity would likewise be undermined by treating a ballast-related FELA claim differently than a ballast-related state-law claim. *See Nickels*, 560 F.3d at 430.

The FRSA's express goal of national uniformity in the laws, regulations, and orders related to railroad safety compels us to agree with the *Lane*, *Waymire*, and *Nickels* courts that the FRSA's express preemption clause can be applied under certain circumstances to preclude a federal tort claim under the FELA. And as the *Nickels* court observed, although a railroad is less likely to have to defend against a state-law claim alleging negligent ballast size and composition than it is a FELA claim alleging negligent ballast size and composition, those odds do not justify treating the two claims differently, thus ultimately undermining uniformity. Accordingly, aside from BNSF's burden to demonstrate compliance with the ballast regulation, which we address below, we hold that Harrison's FELA claim is precluded by the FRSA to the extent that it would have been preempted if brought by a non-employee as a state-negligence claim.

12

### B. The FRSA Ballast Regulation Substantially Subsumes the Subject Matter of Harrison's Suit

As explained, a federal regulation covers the plaintiff's claim if it "substantially subsume[s]" the subject matter of that claim. *Easterwood*, 507 U.S. at 664, 113 S. Ct. at 1738. Harrison alleges that his injuries were caused by BNSF's negligent use of oversized ballast on a steep incline at the Becker Siding. The FRSA's ballast regulation requires that track be supported by material that will "[t]ransmit and distribute the load of the track and railroad rolling equipment to the subgrade"; "[r]estrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails"; "[p]rovide adequate drainage for the track"; and "[m]aintain proper track crosslevel, surface, and alinement." 49 C.F.R. § 213.103.

We hold that the size and composition of track ballast is substantially subsumed by § 213.103's track-support requirements because the size and composition of the ballast unquestionably affect the extent to which the regulation's support, restraint, drainage, and alignment requirements are achieved at a given location. *See Easterwood*, 507 U.S. at 664, 113 S. Ct. at 1738. As the *Nickels* court explained,

> [T]he Secretary has directed railroads to install ballast sufficient to perform key support functions under the conditions applicable to the track. Although these conditions necessarily are track-specific and are not classified as were the grade crossings in *Easterwood*, they effectively narrow the universe of material the railroad may use in a given situation. The regulation thus determines what is a reasonable ballast composition and size for a particular track.

13

*Nickels*, 560 F.3d at 431; *see Lybrand*, 2012 WL 1436690, at *3 ("[T]he Court finds that Plaintiff's claims regarding the size and slope of the ballast are precluded by FRSA."); *Brenner*, 806 F. Supp. 2d at 796 ("We hold that to the extent that Plaintiff's claims are predicated upon allegations of negligence regarding the nature and size of ballast used for track stability, support, and drainage—including mainline, secondary, and yard track—such claims are precluded by 49 C.F.R. § 213.103."); *Pitts*, 61 A.3d at 776 ("We agree with CSX that 49 C.F.R. § 213.103 'covers' and 'substantially subsumes' the use of ballast that supports the track.").

Harrison argues that this case is different from *Easterwood* because unlike the speed regulations, which were "specific" and "objective," the ballast regulation gives track owners discretion in meeting the required track-support functions. "A regulatory framework need not impose bureaucratic micromanagement in order to substantially subsume a particular subject matter." *See In re Derailment Cases*, 416 F.3d 787, 794 (8th Cir. 2005). Moreover, we have already addressed Harrison's specificity argument in the context of our preclusion analysis above.

## C. BNSF's Burden to Establish Regulation Compliance

Our conclusion that the FRSA ballast regulation substantially subsumes the subject matter of Harrison's suit does not end the analysis. Harrison argues that even if the ballast regulation precludes FELA claims based on mainline ballast size and composition, as we have determined, BNSF nonetheless failed to conclusively establish that it complied with the ballast regulation because (1) BNSF's expert is unqualified and his opinion unreliable and (2) BNSF did not prove that "remedying

14

the danger caused by the ballasts would require the railroad 'to strengthen or enlarge the roadbed beyond federal requirements or in contravention of federal law.'" *See Mo. Pac. R.R. Co. v. R.R. Comm'n of Tex.*, 948 F.2d 179, 183 (5th Cir. 1991), *cert. denied*, 507 U.S. 1050 (1993) (*MoPac II*); *Mo. Pac. R.R. Co. v. R.R. Comm'n of Tex.*, 833 F.2d 570, 572 (5th Cir. 1987) (*MoPac I*); *Hendrix v. Port Terminal R.R. Ass'n*, 196 S.W.3d 188, 190 (Tex. App.—Houston [1st Dist.] 2006, no pet.). We address the latter argument first.

### 1. Strengthening and Enlarging Roadbed

In *MoPac I*, several railroads sought declaratory and injunctive relief against the Railroad Commission of Texas, alleging that safety regulations promulgated by the Commission were preempted by the FRSA. 833 F.2d at 572. The district court agreed that several of the regulations were preempted and granted the railroads partial summary judgment. *Id.* One of the regulations included a walkway requirement. *Id.* The regulation defined a walkway as "a pathway located alongside a railroad track or railroad switch for the purpose of providing an area for a railroad employee to perform duties associated with that track." *Id.* at 574. The regulation established "walkway surface, slope, and width specifications and require[d] walkways to be constructed along both sides of all tracks within rail yards." *Id.* In considering whether the walkway regulation was preempted, the Fifth Circuit observed that federal regulations, including the ballast regulation, govern roadbed, track geometry, and track structure and specifically address areas adjacent to the roadbed, in addition to track gauge, alignment, surface, ballast, and drainage. *Id.*

15

The Commission distinguished the federal regulation by arguing that the FRSA did not "cover" the subject matter of *walkways* because the federal regulations do not mandate walkways. *Id.* The Fifth Circuit reasoned,

> It likewise appears in this case that the Commission may seek to enforce "different or higher standards" of track construction by superimposing the walkway requirement on federal track geometry and structure regulations. *This would be the case if, from a practical standpoint, the width, surface and slope requirements of the state walkway regulation generally add to the FRA standards by requiring the railroad to strengthen or enlarge the roadbed beyond FRA requirements.* If the walkway regulation has this effect, we hold that the federal regulation has "covered the subject matter" of track composition and design and that the state regulation conflicts with § 434's purpose to foster national rail safety standards "to the extent practicable."

*Id.* at 575. The Fifth Circuit reversed in part and remanded the case to the district court because it was "unable to determine from the summary judgment record whether such an overlap exist[ed]." *Id.*

On remand, the district court found that "the roadbed would, in fact, have to be enlarged laterally and strengthened in order to support the walkway." *MoPac II*, 948 F.2d at 183. On appeal, the Fifth Circuit concluded that the district's finding was not clearly erroneous and that the state walkway regulation was therefore preempted by the FRSA. *Id.* at 184, 187.

*Hendrix* involved a suit by Hendrix against the Port Terminal Railroad Association (PTRA) under the FELA for injuries that Hendrix allegedly sustained while working as a switchman. 196 S.W.3d at 190. He alleged that his injuries resulted from walking on unsafe walkways in and around railroad tracks that

16

contained "too large and mixed ballast." *Id.* at 193. The trial court granted the PTRA summary judgment on the ground that Hendrix's claims were "preempted" by the FRSA's ballast regulation, 49 C.F.R. § 213.103. *Id.* at 191. On appeal, Hendrix argued that his claims were not preempted because the ballast regulation, which expressly addresses *track* structure and drainage, did not apply to his claims concerning the nature of the ballast on *walkways* around the tracks. *Id.* at 193. Similar to the Fifth Circuit in *MoPac I,* the court of appeals concluded that "the record . . . [was] devoid of testimony from railroad engineers and safety inspectors concerning the issues that underlie[d] the preemption inquiry" and that the court was therefore "unable to determine from the record whether the railroad would be required to strengthen or enlarge the roadbed beyond federal requirements or in contravention of federal law in order to address or remedy the complaints made by Hendrix related to the ballast in the rail yard." *Id.* at 201.

The Fifth Circuit and the First Court of Appeals had to consider, respectively, whether constructing a walkway and using different ballast in areas located adjacent to the track would require the railroad to strengthen or enlarge the roadbed because the federal regulations do not address walkways. *See Norfolk S. Ry. Co. v. Box*, 556 F.3d. 571, 572–73 (7th Cir. 2009) ("The rules for roadbed construction and maintenance do not 'cover' the subject of adjacent walkways."). Therefore, to the extent that the railroad *would* be required to strengthen or enlarge the roadbed beyond the FRSA's requirements, preemption would apply.

17

Here, BNSF was not required to show that providing Harrison with an appropriate surface on which to disembark the train would require the railroad "to strengthen or enlarge the roadbed beyond federal requirements or in contravention of federal law" because, unlike the claims in *MoPac I*, *MoPac II*, and *Hendrix*, Harrison's claims do not implicate ballast conditions on *walkways*; his claims instead concern the size and composition of ballast used for mainline *track support*, a subject for which there is a specific regulation—49 C.F.R. § 213.103. We have already held that the ballast regulation covers the subject matter of Harrison's mainline-ballast claim. Consequently, inquiring into whether BNSF would have to strengthen or enlarge the roadbed—a consideration employed by the Fifth Circuit and the First Court of Appeals to determine whether or not preemption applied— would be a useless act. Accordingly, the standard utilized in *MoPac I*, *MoPac II*, and *Hendrix* is inapposite, and we disregard it.

## 2. BNSF's Expert

BNSF's summary judgment evidence included the affidavit of Dennis Mirabal. BNSF included Mirabal's affidavit to prove that it complied with the ballast regulation. Harrison argues that BNSF failed to prove that it complied with the ballast regulation because Mirabal is not a qualified expert, and his opinions are unreliable.[4]

---

[4]The trial court expressly overruled Harrison's objections to Mirabal's affidavit, which included the arguments we address here.

18

To be competent summary judgment evidence, an affidavit must show affirmatively that the facts sought to be proven therein would be admissible in evidence at a conventional trial and that the affiant is competent to testify to the matters stated. *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996). If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. Tex. R. Evid. 702; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). The expert's opinion must also be relevant to the issues in the case and be based on a reliable foundation. *Robinson*, 923 S.W.2d at 556; *see Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) ("Rule 702's reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions."). We review a trial court's ruling sustaining or overruling objections to summary judgment evidence for an abuse of discretion. *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 567 (Tex. App.—Fort Worth 2008, pet. denied).

Mirabal's affidavit provides in relevant part as follows:

2.    I have worked for BNSF Railway Company for more than fourteen (14) years. Beginning in November 2007, I held the position of Roadmaster for BNSF in Belen, New Mexico. I was Roadmaster when the alleged incident with Mark Harrison occurred on April 19, 2008. In that capacity, I was responsible for the track safety in my territory, including the track structure and ballast of the Becker Siding. I was responsible for BNSF's compliance with the Federal Railroad Safety Act and FRA regulations and BNSF track and ballast standards.

3.     To perform my job duties, I was required to and did possess and demonstrate working knowledge of the FRSA regulations, Federal Railroad Administration Track Safety Standards, BNSF Engineering instructions, and BNSF Maintenance Of Way Operating Rules.

4.     As Roadmaster for BNSF in Belen, New Mexico in April 2008, I was responsible for the inspection and maintenance of the Becker Siding. In this regard, a geometric car was periodically used to inspect the track, put the track under load[,] and ascertain if there was imbalance or instability in the track. Additionally, myself and track inspectors were responsible for inspecting the track on a regular basis to inspect ballast conditions and drainage. We confirmed upon every inspection of the Becker Siding (both before and after the incident) that BNSF Engineering Guidelines, which explicitly incorporate FRSA ballast regulations, were fully satisfied at this location.

5.     On April 19, 2008 and at all times relevant to this lawsuit, BNSF used railroad ballast to support the railroad track structures that BNSF owned, maintained[,] and used including the Becker Siding. The purpose of this ballast is to provide support, stability[,] and adequate drainage to the track structure.

6.     On April 19, 2008, the Becker Siding ballast composition was able to transmit and distribute track and equipment loads, restrain the track under dynamic loads and thermal stress, provide adequate drainage, and maintain proper track crosslevel, surface, and alignment. On April 19, 2008, the Becker Siding ballast fully complied with the FRSA and the FRA track safety standards.

We hold that Mirabal's affidavit demonstrates that he was not only qualified to opine about BNSF's compliance with the FRSA, but that his opinion was based upon a reliable foundation. *See Robinson*, 923 S.W.2d at 557.

Harrison additionally argues that BNSF failed to comply with rule of civil procedure 166a(f) because it did not attach to or serve with the motion for summary judgment the "BNSF Engineering Guidelines" referenced in paragraph four of Mirabal's affidavit. *See* Tex. R. Civ. P. 166a(f). But BNSF referred to the guidelines

20

only to the extent that they incorporate the ballast regulation. We disagree with Harrison's implied assumption that a regulation contained in the Code of Federal Regulations is a "paper" within the meaning of rule of civil procedure 166a(f).

We hold that the trial court did not abuse its discretion by overruling Harrison's objections to Mirabal's affidavit. We further hold that BNSF established as a matter of law that it complied with the ballast regulation, 49 C.F.R. § 213.103.

### D.    Holding

We hold that BNSF met its summary judgment burden to establish as a matter of law that Harrison's FELA claim is precluded by the FRSA and that the trial court did not err by granting BNSF summary judgment. Accordingly, we overrule Harrison's first and second issues.

## V. SUMMARY JUDGMENT ON NON-BALLAST FELA CLAIMS

In his third issue, Harrison argues that the trial court erred by granting summary judgment on his "non-ballast" FELA claims because BNSF did not move for summary judgment on those claims.

It is well established that a summary judgment cannot be affirmed on a ground that is not specifically presented in the motion for summary judgment. *Travis v. City of Mesquite*, 830 S.W.2d 94, 100 (Tex. 1992).

Harrison alleged that he "was injured while stepping off a train" and that he "suffered injuries to his knee and body generally as a result of slipping on oversized ballast on a steep incline." He also alleged that BNSF owed him a duty "to provide

21

reasonably safe ballast and a reasonably safe area to disembark." These allegations clearly relate to Harrison's mainline ballast claim.

The only other allegation that does not expressly relate to Harrison's ballast claim—when read in isolation—is the allegation that BNSF owed him a duty "to provide a reasonably safe place to work." However, just below that allegation, Harrison pleaded that BNSF "knew or should have known that *disembarking* and *walking on sloped ballast* increased the danger of injury and/or *created an unsafe place to work*" and that BNSF "knew or should have known that *disembarking* and *walking on large and/or mainline ballast* increased the danger of injury and/or *created an unsafe place to work.*" Thus, Harrison's safe-place-to-work allegation is actually an extension of his FELA ballast claim; thus, he never pleaded a non-ballast FELA claim, and BNSF had no reason to specially except to the pleading.

To the extent that the concurring and dissenting opinion suggests otherwise, we do not by implication hold that all FELA claims relating to railway ballast in any way are *ipso facto* precluded by the FRSA. Rather, our holding is narrow and unambiguous: The only claim alleged by Harrison—one for injuries that he allegedly sustained while stepping onto mainline, or track support, ballast—is precluded by the FRSA. Consequently, except where noted above, we decline to further supplement this opinion with inapposite caselaw and analysis distinguishing FELA claims premised upon injuries sustained while walking on ballast used for a walkway or other area that does not support the track. *See* Tex. R. App. P. 47.1. We overrule Harrison's third issue.

22

## VI. Conclusion

Having overruled all of Harrison's issues, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

GABRIEL, J. filed a concurring and dissenting opinion.

DELIVERED:  January 30, 2014